332 F.Supp. 1302 (1971)
In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.
MORGAN GUARANTY TRUST CO., Trustee
v.
PENN CENTRAL TRUSTEES.
No. 70-347.
United States District Court, E. D. Pennsylvania.
September 30, 1971.
Robert Blanchette and James Howard, Philadelphia, Pa., for Trustees, Penn Central Transportation Co.
Blank, Rome, Klaus & Comisky, by Marvin Comisky and Norman L. Holmes, *1303 Philadelphia, Pa., Special Counsel to Trustees, Penn Central Transportation Co.
Tate & Ervin, by W. Bourne Ruthrauff, Philadelphia, Pa., for Richard Joyce Smith, Trustee, New York, New Haven & Hartford R.R.
Davis, Polk & Wardwell, by Stephen H. Case, New York City, for Morgan Guaranty Trust Co. of New York, as Trustee.
Fox, Rothschild, O'Brien & Frankel, by Nochem S. Winnet, Philadelphia, Pa., for First Nat. City Bank of New York.
Drinker, Biddle & Reath, by Rush T. Haines, II, Philadelphia, Pa., for Chase Manhattan Bank.
Ballard, Spahr, Andrews & Ingersoll, by Morris Cheston, Jr., Philadelphia, Pa., for Girard Trust Bank, Indenture Trustee.
Morgan, Lewis & Bockius, by John N. Schaeffer, Jr., Philadelphia, Pa., for Fidelity Bank.
Willkie, Farr & Gallagher, by Walter H. Brown, Jr., New York City, for Institutional Investors, Penn Central Group.
Kelley, Drye, Warren, Clark, Carr & Ellis, by Frank H. Heiss, New York City, for Manufacturers Hanover Trust Co., as Trustee.

MEMORANDUM
FULLAM, District Judge.
The Trustees have petitioned for authorization to make certain improvements to the railroad's major interchange yard at Selkirk, New York. The proposed improvements include the construction of two additional tracks to facilitate westbound departures from the classification yard, a bridge over the departure yard area, an additional lead track, and a conductor's tower.
Substantially all east-west freight traffic to and from the New England and New York areas is classified and routed through this yard, a modern, automated facility. The yard at present can handle efficiently approximately 2,700 freight cars per day. When volume exceeds that level, costly delays result. It is estimated (affidavit of Richard B. Hasselman, Assistant Vice President for Transportation) that elimination of these delays would save the railroad approximately $726,000 per year; and that approximately $350,000 in costs at other yards could be saved annually if certain additional traffic were diverted through Selkirk. These amounts are over and above the substantial economies stemming from the substitution of "all rail" routing for the costly and time-consuming "floating" operation in New York harbor.
Traffic through the Selkirk Yard already exceeds the 2,700 per day figure and, by reason of the changes in operating methods mentioned above, appears certain to increase still more.
The project under consideration was started in 1969, at a cost, during that year, of $896,112.02. The cost to complete these improvements is $2,074,549.
The yard at Selkirk is subject to the liens of the following mortgages of the New York Central and Hudson River Railroad Company, in the following order of priority: (1) 3½% Gold Bond Mortgage, dated June 1, 1897; (2) Consolidated Mortgage, dated June 20, 1913; and (3) Refunding and Improvement Mortgage, dated October 1, 1913. It is undisputed that the proposed improvements would constitute "additions and betterments" to the mortgaged property and would be subject to the liens of these mortgages.
In order to obtain the funds to complete the project, the Trustees propose to draw upon certain escrow funds now on deposit, representing (directly or indirectly) proceeds from the sale of mortgaged property. There is now on deposit (as of July 31, 1971) with the Girard Trust Bank, pursuant to Order No. 192 and Order No. 271 in these proceedings, approximately $333,214 attributable to sales of property subject to the three mortgages mentioned above. There is on deposit (as of August 27, 1971) with Manufacturers Hanover Trust Company, the indenture trustee of *1304 the first mortgage mentioned above, pursuant to Order No. 78 herein, and not subject to any other requests by the Trustees, a balance of approximately $100,264.67 similarly derived. In addition, there is on deposit with Manufacturers (as of August 27, 1971) the further sum of approximately $1,756,477.99, which, for present purposes, may likewise be deemed to represent proceeds from the sale of mortgaged property.[1] The provisions of the first mortgage expressly permit the use of proceeds from sales of mortgaged property for "the purchase of other property, real or personal, or in betterments of, or improvements upon, some part of the mortgaged premises" (first mortgage, section 1 of article 6). Substantially similar provisions are contained in the other two mortgages (second mortgage, section 6 of article 8; third mortgage, section 6 of article 11).
At the hearing the indenture trustees of the first and second mortgages expressed their willingness to have the Court grant the Trustees' application, if the Trustees would agree to replace the escrowed funds within two years, from the proceeds of sales of other properties, or otherwise. The Trustees are willing to accept this condition, it being clearly understood by all concerned that acquiescence in this solution is entirely without prejudice to the right of either party to assert a different position with respect to future applications, or with respect to the disposition of the replaced funds. A form of decree, acceptable to the Trustees and to the indenture trustees of the first and second mortgages, has been presented.
The only objection to the proposed arrangement comes from Morgan Guaranty Trust Company of New York, the indenture trustee under the third mortgage. Understandably enough, Morgan Guaranty prefers to have cash on deposit as security for its lien, rather than "bricks and mortar," and earnestly contends that the record does not justify permitting the use of liened cash to pay for additions and betterments to the mortgaged property.
As noted above, all parties agree that the proposed improvements would constitute "additions and betterments" within the mortgage terms. It is also agreed that the proposed improvements are necessary for the efficient operation of the railroad, and would benefit the Debtor's estate. And all parties recognize the validity of the criteria for approval of this kind of expenditure in railroad reorganizations, adopted in In re Central Railroad Company of New Jersey v. Manufacturers Hanover Trust Co., 421 F.2d 604 (3d Cir. 1970): (1) The funds are presently needed and cannot be obtained elsewhere; (2) the money drawn down and expended for additions and betterments will materially contribute to the possibility of successful reorganization and to the continuation of the transportation plant, or a substantial part thereof, as a going concern; (3) the interests of the bondholders are not thereby prejudiced; and (4) reorganization is probably feasible.
Morgan Guaranty argues that the record does not establish that the necessary funds cannot be obtained from some other source, or that the bondholders' interests would not be prejudiced, or that reorganization will probably be achieved.
There is clearly no merit to the suggestion that these funds could properly be obtained from some other source. While it is of course correct that the Trustees could pay for these improvements with cash on hand, this cash will obviously be required to meet operating expenses. Morgan Guaranty points out that the Trustees have not yet drawn down the last $25,000,000 of the $100,000,000 proceeds from the sale of government-guaranteed *1305 Trustees' certificates. However, these funds are expressly earmarked for operating expenses and, on the basis of current forecasts, will probably be exhausted during the next six months. No other source of funds has been suggested by Morgan Guaranty, and it is a matter of common knowledge that the Debtor is presently unable to obtain financing, except perhaps in the preferred category of equipment obligations, unless accompanied by government guarantee.
Since escrowed cash primarily secures the first mortgage, and would not likely be available to the third mortgage holder in any event, it seems doubtful that the proposed change in the form of security would be of much practical significance to the third mortgagee. Be that as it may, the circumstances demonstrate that none of the holders of the three mortgages here involved has valid ground for complaint. The value of their security has been increased to the extent of some $26,000,000 by previous additions and betterments at the Selkirk Yard, over and above previous draw downs. Whether the Trustees would be legally entitled to the outright release of escrowed funds by reason of these pre-bankruptcy additions and betterments is not now before me for decision, but it is at least clear that this factor makes it difficult to take seriously any contention that the transaction now under consideration would unfairly deplete the value of the mortgage security.
Morgan Guaranty relies chiefly upon its contention that the record does not establish that reorganization of the Debtor "is probably feasible." Perhaps a short answer to this contention would be to point out that the present prospects for successful reorganization of the Debtor are undoubtedly at least as good as were the prospects of the Central Railroad of New Jersey, or in the New Haven case relied upon by the Court of Appeals in the Central Railroad of New Jersey case, supra. However, it is difficult to quarrel with the statement of Morgan Guaranty's counsel at oral argument that he could derive little comfort from these analogies. In my view, the requirement of a finding that reorganization is probably feasible requires some further refinement as applied to this case.
At the present time, no plan of reorganization has yet been proposed by anyone. The Trustees have requested an extension of six months in which to determine whether a successful plan can be proposed, and a hearing on that application is scheduled for October 15, 1971. To interpret the Central Railroad Company of New Jersey case as imposing an absolute requirement that, before authorizing the use of liened funds for additions and betterments, the reorganization court must be able confidently to predict the future course and ultimate outcome of the reorganization proceedings would, in my view, unduly exaggerate that court's holding.
Preliminarily, it may be observed that to make such a flat finding at this point would be to anticipate matters which will be argued at the October 15 hearing. Yet the present application cannot wait until after that hearing, because the approach of winter makes it essential that these improvements be processed immediately.
More importantly, I believe the "probable success" criterion must be considered in the light of (a) the stage of the reorganization proceedings at which the issue of the proposed expenditure is presented; (b) the magnitude of the railroad operations involved in the reorganization; and (c) what is meant by a successful reorganization. Where, as in the present instance, the issue arises at a relatively early stage of the reorganization proceeding, when it is too early to make confident predictions one way or the other, I believe it should be sufficient to find merely that there is no demonstrated likelihood of failure.
Given the magnitude of the Debtor's operations, it would obviously be unwise to defer essential capital improvements, which would greatly enhance the likelihood *1306 of viability, merely because of present uncertainty as to the outcome of the reorganization. Particularly is this true when the proposed improvement involves a portion of the railroad which, under any conceivable view, will always form an integral and essential part of an important railway system; and when the lien security would not thereby be diminished.
In short, it is my view that, so long as the reorganization court can properly conclude that it is reasonably probable that the ultimate outcome of the reorganization proceeding, whether by reorganization plan or otherwise, will be such that the interests of the lienholders in question will not have been adversely affected by approval of the proposed expenditure, the requirements of the Central Railroad Company of New Jersey case are met. On the present record, I have no hesitation in making such a finding.
For the reasons stated, the form of order agreed to by the Trustees and the indenture trustees of the first two mortgages will be approved.
NOTES
[1] Under the terms of a letter agreement dated September 22, 1961, between the Debtor's predecessor and Manufacturers, proceeds from sales of mortgaged real estate were used by Manufacturers to finance purchases of rolling stock by the railroad, under conditional sales agreements. Repayments by the railroad pursuant to the conditional sales agreements are held in escrow, subject to the mortgage, the same as the original sale proceeds.